Logan Square Auto Mart, Inc., et al. [1] v. Commissioner. Logan Square Auto Mart, Inc. v. Commissioner
Docket Nos. 53437-53439, 67710-67715.
United States Tax Court
T.C. Memo 1960-6; 1960 Tax Ct. Memo LEXIS 282; 19 T.C.M. (CCH) 19; T.C.M. (RIA) 60006; January 28, 1960
Robert J. Downing, Esq., 141 W. Jackson Blvd., Chicago, Ill., for the petitioners. Arthur N. Nasser, Esq., and Paul Levin, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: The respondent determined deficiencies in income taxes of the petitioners, and additions to tax, in the years and in the amounts as follows: Additions to Tax
Petitioner
Dkt. No.
Year
Deficiency
Sec. 293(b) [2]
Logan Sq. Auto Mart, Inc.
53437
1946
$ 4,806.45
$2,528.26
James E. Healy
53438
1946
10,069.93
5,034.97
Est. of Alvin A. Urban, Deceased, Orville
E. Urban, Executor
53498
1946
10,647.38
5,323.69
James E. Healy, Elizabeth Healy
67710
1948
8,373.40
4,186.70
James E. Healy
67711
1947
9,964.81
4,982.41
Est. of Alvin A. Urban, Deceased, Est. of*lAlyce Urban, Deceased, Orville E. Urban,
Executor
67712
1948
9,359.80
4,679.90
Est. of Alvin A. Urban, Deceased, Orville
E. Urban, Executor
67713
1947
12,185.53
6,092.77
Logan Sq. Auto Mart, Inc.
67714
1947
1,101.18
550.59
1948
906.26
453.13
Logan Sq. Motors, Inc.
67715
1946
10,543.02
5,271.51
1947
12,792.93
6,396.47
1948
11,684.60
5,842.30
*283 The issues for decision, common to each year, are: (1) Whether individual petitioners James E. Healy and Alvin A. Urban, or either of them, or any other person, acting on behalf of the corporate petitioners, in selling new and used cars, received certain amounts which were not properly recorded on the corporate petitioners' books and records, resulting in unreported income; (2) Whether any such allegedly omitted amounts constitute "constructive" dividends to the individual petitioners for the years involved; and (3) Whether any failure to report such amounts as income of any of the petitioners was due to fraud with intent to evade tax, thus justifying imposition of the addition to tax provided by section 293(b). Whether or not the years 1947 and 1948 are barred by the statute of limitations depends on whether or not fraud with intent to evade tax was present in those years. In dockets numbered 53439, 67712 and 67713, petitioners offered no evidence in respect of the insurance commissions for 1946, 1947 and 1948, and are hereby deemed to have abandoned the deficiency issues as to those items. Conversely, *284 respondent did not prove their existence, and his determination of a fraudulent failure to report them is not sustained. Certain other issues have been disposed of pursuant to stipulation of the parties, which will be given effect in the Rule 50 computation. Findings of Fact In General Some of the facts are stipulated and are hereby found as stipulated. Logan Square Auto Mart, Inc., (hereinafter sometimes referred to as Auto Mart), is an Illinois corporation, incorporated on October 24, 1941, with offices located in Chicago. During the years 1946 and 1947, Auto Mart operated a Hudson automobile agency in Chicago and was in the business of selling new and used automobiles. Late in 1947 it lost its Hudson agency and thereafter confined its operation to the sale of used automobiles. Logan Square Motors, Inc., (hereinafter sometimes referred to as Logan Square), is an Illinois corporation, incorporated on September 5, 1931, with offices and business premises located in Chicago approximately a half block from those of Auto Mart. During the years here involved it operated a Nash automobile agency and was in the business of selling new and used automobiles. James E. Healy (hereinafter *285 referred to as Healy), and Elizabeth Healy were husband and wife during the years in question and are still married. They reside in Chicago. Alvin A. Urban (hereinafter referred to as Urban), and Alyce Urban were husband and wife during the years in question and resided in Chicago. Alyce died on October 28, 1957, and Urban died on October 29, 1957. The corporate petitioners filed their income tax returns for the calendar years 1946, 1947 and 1948 on an accrual basis with the collector of internal revenue for the first district of Illinois. The individual income tax returns of Healy and Urban for the years 1946 and 1947 and the joint income tax returns of Healy and Elizabeth and Urban and Alyce for the calendar year 1948 were filed with the collector of internal revenue for the first district of Illinois. During the years in question Urban and Healy each owned 50 per cent of the capital stock of each corporate petitioner, directly or through nominees, with the exception of the period January 1 to 10, 1946, in respect to Logan Square, when they each owned one-third of its stock. Urban was secretary of Logan Square from January 10, 1933, until January 10, 1946, when he became its *286 president, a position he retained through the year 1948. During the years in question Healy was president of Auto Mart. Healy had been treasurer of Logan Square from 1933 until the beginning of 1946 and Urban had been the secretary of Auto Mart at the time of its organization and for an indefinite period. However, early in the year 1946 Urban was formally "disassociated" from Auto Mart, in that his stock was held by nominees and he held no corporate office, and Healy was in the same position in respect to Logan Square. This apparent disassociation continued during the years here involved; its purpose was the retention by the corporations of their respective franchises. However, Urban and Healy sometimes had lunch together when they would discuss the businesses of the corporations. They would formulate policy for the corporations and during the years involved Healy knew generally of the operations of Logan Square. For each of the years in question the income tax returns of Logan Square were signed by Urban and those of Auto Mart by Healy as their presidents, respectively. Healy received salaries from Auto Mart and Logan Square in the amounts and during the years in question as follows: *287 Year
Auto Mart
Logan Square
1946
$12,000
$ 1,075.00
1947
15,000
1948
3,125
19,324.66 Urban received from Logan Square as salary the amounts of $12,000, $20,000, and $1,300, during the years 1946, 1947 and 1948, respectively. The corporate petitioners deducted, and Healy and Urban included on their respective returns, the amounts of salary so paid during these years. On December 1, 1948, Logan Square declared a dividend on its common stock in the amount of $20,000, of which $10,000 was paid to Healy, and $10,000 to Urban. The payment of the dividend was reflected in a schedule, attached to the corporate return, as a charge to earned surplus. Healy and Urban reported the dividend on their respective 1948 income tax returns. Healy, Urban and their wives reported no other amounts as income for the years in issue. During the years in question, both Logan Square and Auto Mart maintained their books and records on an accrual method. They kept the following books of original entry: general ledger; cash receipts, cash disbursement, purchase, and general journals. Auto Mart kept separate journals for new car and used car sales while Logan Square kept one journal *288 for these purposes. Further, Logan Square kept a payroll journal, a petty cash journal, and a parts and service sales book. Walter J. Smyth (hereinafter referred to as Smyth), a public accountant, was employed by Logan Square and Auto Mart on a part-time basis during the year 1946 and until March 1947, at which time he became accountant and office manager of both corporations. He remained with the corporations on a full-time basis until 1951. Smyth prepared the income tax returns of both corporations for the years in question from the books and records of each corporation; these returns reflected all and only all the items set forth in the respective books and records. Smyth also prepared the individual returns of Urban, Healy and their respective joint returns with their wives for the years in question from information obtained from the books and records of the corporations and from information supplied by the taxpayers. During the years in question, there was a shortage of automobiles in relation to the demand. Consequently, automobile dealers, including the corporate petitioners, were often able to demand of a customer that all or part of the sales price be paid in cash (i. *289 e., currency). Further, they were able to demand that a customer trade in a used automobile (hereinafter referred to as a "trade-in"), as a prerequisite to purchasing a new one, for which he would be allowed against the new car price, an amount often considerably below the fair market value of such a used automobile sold outright either to an individual or to a dealer. To what extent the corporate petitioners indulged in such practices is hereinafter set forth. Sales and trade-in allowances were entered on the books and records of Logan Square and Auto Mart from the information as to sales prices and trade-in allowances shown on bills of sale prepared by the corporations. If an additional amount was received on a sale and was not included on the bill of sale as part of the sales price, it would also be omitted from the books and records and income tax returns of the selling petitioner. If there was a trade-in received but not shown on the bill of sale, such a trade-in would not be reflected on the books and records of the corporation and its subsequent sale would not be reported on its income tax return. The bills of sale were prepared by an office girl at the direction of Healy, *290 or Urban, or any salesman who might have made the sale. The office employee would not know anything of the sale except the facts and figures given to her by the person making the sale. During the years 1946, 1947 and 1948 Al Kohn (hereinafter referred to as Al), and his brother Seymour were co-owners of Logan Square Willys, Inc., (hereinafter referred to as Willys), and were engaged in the business of selling new and used automobiles. During the years 1947 and 1948 they purchased used cars from Logan Square and Auto Mart solely through Urban and Healy. Al purchased about 95 per cent of such automobiles. Al paid for some of these automobiles by check and for some by cash. Occasionally on such purchases he received a certificate of title in the name of an individual unknown to him. On some purchases Healy and Urban would request Al to have Willys record the purchase as though made from the individual whose name appeared on the certificate of title; such individual would in fact be a customer who had traded in a car on the purchase of a new automobile from either Logan Square or Auto Mart. On some of these occasions Al paid for the cars with cash. In United States District Court *291 for the Northern District of Illinois, on January 17, 1956, Urban pleaded guilty to counts 1 to 6, inclusive, of an indictment charging that he "did wilfully and knowingly attempt to defeat and evade a large part of" the taxes due and owing by him and the corporate petitioners for the years 1947 and 1948, and by his wife for the year 1948, "by filing and causing to be filed with the Collector * * * false and fraudulent" income tax returns, in violation of section 145(b) of the Internal Revenue Code. Corresponding counts against Healy were dismissed by order of the court upon motion of the Government by the United States Attorney. The corporate petitioners reported gross sales of the following amounts during the years in question: Year
Auto Mart
Logan Square
1946
$182,457.84
$439,381.17
1947
166,595.46
551,036.40
1948
30,420.90
637,573.86
According to their tax returns, Auto Mart and Logan Square had earnings and profits in the amounts and as of the end of the years involved, as follows: Year
Auto Mart
Logan Square
1946
$15,830.01
$24,679.11
1947
13,547.08
53,025.53
1948
11,842.61
68,470.03
Some *292 of the sales made by each corporate petitioner for each year here involved were properly recorded on its books and records, and the purchasers in those transactions were not requested to pay any part of the sales price in cash. In the findings of fact for each year, set forth below, unless otherwise stated therein, it is hereby found, in respect to the specified sales, that: Every sale was transacted on the business premises of the particular corporate petitioner involved, and that whoever is named, or left unidentified, as the person making the sale, handling the transaction, or receiving any portion of the sales price, acted on behalf of the corporate petitioner in question; On the sale of any automobile, whether new or used, the portion of the sales price here in issue as being allegedly unreported income was received in the same year that the sale was made; Of the total sales price of any automobile sold, where the full price was received partly in cash only the amount of the payment exclusive of the cash was recorded on the books and records of the corporation as the sales price of the automobile sold; Where, on the sale of an automobile, a trade-in was received by a *293 corporate petitioner, the petitioner recorded as the sales price of the automobile it was selling the dollar amount it received, plus the trade allowance, if any. If a petitioner allowed nothing on the trade-in, it recorded only the other amount received as the sales price. Whether any such allowance was made or not, the fact that a trade-in was received by the petitioner was not reflected either on the bill of sale or on the books and records of the petitioner. Further, where such a trade-in was sold to Willys, or any other concern, the fact that such a sale was made and the amount received from the purchaser was not recorded on the books and records of the petitioner. 1946 According to the books and records of Auto Mart, it sold 27 used and 103 new automobiles during the year 1946. On June 27, 1946, Auto Mart sold a new Hudson automobile to Leon Klesman for $2,045.82. Of that amount, $1,645.82 was received by check and $400 was received in cash by Urban. Auto Mart sold to David M. Friedman on August 21 a new Hudson automobile for $1,959.69. The amount was received by two checks, one for the amount of $1,659.69 and one in the amount of $300. The sale price was shown on the *294 bill of sale and entered on the books and records of Auto Mart as $1,659.69. The transaction was handled by an unidentified person. However, when Friedman went to Auto Mart to take possession of his automobile, he talked to Healy. Auto Mart sold a new Hudson to Theodore A. Matlak on September 17 for the amount of $1,783.43 and a 1935 Chrysler automobile, which had been driven more than 120,000 miles and for which Auto Mart made no allowance. The sale and the appraisal of the trade-in was made by Healy and a salesman, W. R. Phelps (hereinafter referred to as Phelps); the purchaser paid the amount of $1,783.43 in cash to Healy and Urban. The sales price was recorded on the bill of sale and the books and records of Auto Mart as $1,783.43. According to the sales journal of Logan Square, it sold 97 used and 201 new automobiles during the year 1946. On September 28, Logan Square sold a Nash "demonstrator" to Edward A. Rozetka for $1,900, the amount Rozetka offered for the car. Of that amount $1,200 was paid by check, and $700 was paid to Urban in cash. Urban had requested Rozetka to make part of the payment in cash. On November 16 Logan Square sold a new Nash to Plating Service *295 Company for $1,991.09. The amount of $1,591.09 was paid by check, and Urban received the remaining $400 in cash at his request. Logan Square sold a new Nash to William J. Blagg on December 9 and received $1,917.49 in full payment. Logan Square received $400 of this amount in cash at its request. The sale price was shown on the bill of sale and entered on the books and records of the corporation as $1,517.49. The payment of the $400 in cash was in excess of the regular price of the car; it was a "bonus" for obtaining the car immediately. In his statutory notice of deficiencies for the year 1946, respondent determined that Auto Mart and Logan Square failed to report income from the sales of automobiles in the amounts of $12,362 and $26,870, respectively. He further determined that Healy and Urban failed to report as income constructive dividends from the corporate petitioners in the amount of $19,616 to each of them. 1947 According to its sales journals, Auto Mart sold 10 used and 84 new cars during the year 1947. On May 19, 1947, Auto Mart sold a new Hudson to Frank Kolasinski for $2,024.89. In part payment, Auto Mart received a 1939 Hudson for which Auto Mart made an allowance *296 of $25 or $30 against the sales price of the automobile. Healy handled the transaction. In the year 1947, Auto Mart sold the 1939 Hudson to Willys for the amount of $400. On June 9, Auto Mart, acting through Urban, sold a new Hudson to Andreas Jorgensen for $2,443.38. Of that amount, $2,193.38 was received by a cashier's check and $250 was received in cash by Urban. On June 16, Phelps, acting for Auto Mart, sold a new Hudson to George Lindemann for $1,995.69. Auto Mart received in part payment a 1939 Lincoln Zephyr for which it made an allowance of $100 against the total price. The remaining portion of the sales price was paid by two checks. In 1947 Auto Mart sold the Lincoln Zephyr to Willys and received in full payment the amount of $450 in that year. On July 15, Auto Mart, through Phelps, sold a new Hudson to Owen W. Elmen for a price of $1,761.22. Urban received for Auto Mart in that year the amount of $1,661.22, plus a trade-in, a 1939 Chevrolet which had been driven 100,000 miles, in full payment for the Hudson. Auto Mart allowed $100 for the used car against the total price. On October 15, Auto Mart sold a new Hudson automobile, which was purchased in the name of Bernard *297 M. Larsen, for $2,075.09. Urban handled the transaction which took place on the premises of Logan Square. Auto Mart received in 1947 a check in the amount of $2,025.09 and a 1936 DeSoto in full payment, Auto Mart allowing $50 for the used DeSoto which had just recently broken down. Healy signed the bill of sale. According to its sales journal, Logan Square, during the year 1947, sold 58 used and 221 new cars. On May 13, Logan Square sold a new Nash to Thaddeus J. SOBOLEWSKI FOR THE AMOUNT OF $1,606.74, RECEIVING IN FULL PAYMENT THE AMOUNT OF $1,406.74 PLUS A USED 1940 Nash, for which Logan Square allowed the sum of $200. After respondent began his examination, Urban requested Sobolewski to tell the examining officers that he had sold the used Nash to another dealer. On May 23, Logan Square sold a new Nash to Julius Hoffman for the sales price of $1,741.30, receiving in full payment the amount of $1,741.30 plus a used 1936 Nash. Logan Square made no allowance for the used Nash against the sales price. Urban made the sale. On May 28, Logan Square sold the 1936 Nash to Willys for the amount of $350. On May 28, Logan Square sold a new Nash to Edmund Helminiak for the price of $1,785. *298 Of that amount, $250 was received in cash by Urban. On June 9, Logan Square sold a new Nash to Harold C. Durland for $2,002.72, exclusive of insurance and finance charges, and received in full payment, the amount of $1,702.72, and a 1939 Nash Lafayette, for which Logan Square allowed $300. On June 10, Logan Square sold the Nash Lafayette to Willys for the amount of $550. On June 16, Logan Square sold a new Nash to F. A. Mackowiak for $2,154.70, which amount was recorded as the sales price, and received in part payment a 1941 Packard. On July 1, Logan Square, acting through Urban, sold a new Nash to E. T. Brankey for $2,309.03, of which sum $2,059.03 was received by check, and $250 was received in cash by an unidentified person. On July 30, Logan Square sold a new Nash to Peter Lombardo for $2,122.63, receiving payment by check for $1,472.63, and a 1941 Pontiac, for which Logan Square allowed $650. Urban handled the transaction. On July 31, Logan Square sold the Pontiac to Willys for the amount of $1,100. On August 29, Logan Square sold a new Nash to Sylvin M. Kaczorowski for $2,130, of which sum $300 was received in cash by Urban, who handled the transaction. On September *299 13, Logan Square sold a new Nash to Abe L. Sippil for $2,124.37, of which sum $1,824.37 was received by check, and $300 was received in cash by Healy, who handled the transaction. On October 13, Logan Square sold a new Nash to Ted F. Michno for $2,000, of which sum $1,000 was received by check, and $1,000 was received by Urban. The sales price was entered on the bill of sale and books and records of the corporation as $1,817.14; omitted was the receipt of the amount of $182.86 in currency. On December 4, Logan Square sold a new Nash to Felix Majka for $2,270.07, and received in full payment two checks, dated December 2 and 6, and in the amounts of $170.37 and $1,679.63, respectively, and a 1941 Plymouth. An unidentified person handled the transaction. On December 8, Logan Square sold the Plymouth to Willys for $800. Logan Square sold two new Nash automobiles, one on May 24, and another on October 4, to Louis S. Sliva, who was then a dealer in new and used automobiles. Sliva dealt with Urban, who, on each sale, requested a cash payment of either $400 or $500 in excess of the price stated on each bill of sale. Sliva made the cash payments to Urban as requested. During the year *300 1947, Roy O. Gibson was in the business of buying and selling used cars. Logan Square sold an automobile to him on April 12, and another on April 25, recording on its books and records as their sales prices the amounts of $450 and $500, respectively. In fact, the sales price for each automobile was $800, paid by three checks in the amounts of $800, $500 and $300, made payable to Logan Square. During the year 1947, Logan Square sold at least 13 used automobiles to Willys, and on each sale entered on its books and records as the sale price an amount less than that actually received; the recorded sale prices totaled $6,550, while the actual sales were in the total amount of $10,525, for a total unreported sales price amount of $3,975. In his statutory notices of deficiencies for the year 1947, respondent determined that Auto Mart and Logan Square failed to report income from the sales of automobiles in the amounts of $5,210.11, and $32,335.94, respectively. He further determined that Healy and Urban failed to report as income, constructive dividends from the corporate petitioners in the amount of $18,773.02 to each of them. 1948 According to their respective sales journals, Auto *301 Mart sold 43 used automobiles, and Logan Square sold 77 used and 229 new cars during the year 1948. During the year 1948, Urban, acting for the corporate petitioners, sold a number of used automobiles to Ryan Brothers, a partnership composed of James L. Ryan and his brother. The partnership was engaged primarily in the business of selling gasoline and renting utility trailers, and only incidentally in the buying and selling of used automobiles. James purchased the cars for the partnership. About one-half of the sales were made at Logan Square, and the other half were made at the partnership's place of business. In four of such sales, made by Urban on behalf of Auto Mart, [3] the sales prices were entered in the books and records of Auto Mart in a total amount of $1,900, whereas the actual price totaled $3,125, resulting in unreported sales receipts of $1,225. On two sales to Ryan Brothers, Logan Square understated its receipts on its books and records in the total amount of $365. *302 On January 6, 1948, Logan Square sold a new Nash to Arnold F. and Sophie H. Kolenburg for $2,250, receiving the amount of $2,100 and a used Chevrolet in full payment, Logan Square allowing $150 for the trade-in. Urban handled the transaction. On January 29, Logan Square sold a new Nash to Menzel Hardware Company for the amount of $1,973.74, exclusive of insurance and finance charges, and received in part payment a 1940 Nash for which it allowed the sum of $273. Healy made the sale, and Felix Panfil, as its secretary, purchased the car for the company. At Logan Square's office, Healy directed Felix to sign his name on the back of a blank check, explaining that his request had to do with the selling of the 1940 Nash "wholesale." Felix was anxious to obtain the new Nash and trusted Healy, so he complied with his request by signing, "Menzel Hdwe Co. F. L. Panfil Sec'y." In form, the check was one on which Willys was indicated as the drawer. On or around January 31, Logan Square sold the 1940 Nash to Willys for $700. Willys paid for the Nash with the same check that Felix had endorsed. The hardware company was named the payee, the check was made out for the amount of $700, and Seymour *303 Kohn signed it as drawer and endorsed it on its back, Logan Square; and neither Felix nor the hardware company received the proceeds of this check. On February 20, Logan Square sold a new Nash to Louis A. Haake for $2,378.80, receiving a cashier's check in the amount of $1,500 and a 1941 Buick, for which Logan Square made an allowance of $878.80. Haake had known Healy for several years, and primarily, Healy handled the transaction, but Urban also took part. Urban and Healy informed Haake that they had sold his Buick to another Buick dealer, and in connection with that, it was necessary that Haake endorse a check, which Haake did. On the same day Logan Square sold the Buick to Willys for $1,025, and Willys paid for it with the same check, which had been made payable to L. A. Haake, Sr., in the amount of $1,025, and signed by Seymour Kohn, for Willys, as drawer. In April of 1952, Haake, at the request of Urban and Healy, signed a document which, either as unnoticed by Haake at the time, or as later filled in, stated that Haake had not traded in a used car in his transaction with Logan Square. On February 23 Logan Square sold a new Nash to Harry Mazure for $2,238, which sum was received *304 by Urban. The sales price was entered on the books and records of Logan Square as $1,938; $300 of the total amount received was omitted from the books and records of the corporation. On February 24 Logan Square sold a new Nash to Dorothy Dietz for $2,525, of which amount $300 was received in cash by Urban at his request. On February 25, Logan Square sold a new Nash to Erwin J. Sievers for $2,230, paid for by certified check in the amount of $1,930, and $300 which was received by Urban in cash at his request. On March 10, Logan Square sold a new Nash to Stanley C. Martinkus for $1,975.42, receiving in full payment the sum of $1,925.42 and a 1936 Pontiac, 4-door touring sedan for which Logan Square allowed the sum of $50. On March 11, Logan Square sold the Pontiac to Willys for the sum $425of. On March 22, Logan Square sold a new Nash to George Mindak for $1,933.35 and received in full payment the sum of $1,833.55 and a 1939 Dodge, for which Logan Square allowed $100. In that year Logan Square sold the Dodge to Willys for the sum of $600. On April 2, Logan Square sold a new Nash to Roy Shadduck for $2,638.21, received by two cashier's checks payable to Logan Square, which totaled *305 $2,638. Urban made the sale and received the payments. The sales price was entered on the bill of sale and the books and records of Logan Square as $2,338.21; the receipt of $300 was omitted. On April 2, Logan Square, acting through Urban, sold a new Nash to Joseph J. Kelcz for $1,895.41, exclusive of insurance and finance charges, and received payment in the amount of either $1,595.41, or $1,545.41, and a 1941 Plymouth trade-in, for which it allowed the sum of either $300 or $350. The sale price of the Nash was entered on the books and records of Logan Square as $1,895.41. On April 20, Logan Square sold a new Nash to Ludwig H. Koepke for $1,375, receiving a sum of money and a 1941 Nash in full payment. Urban handled the transaction. On May 8, Logan Square sold a new Nash to Fred Parisi for $1,800, exclusive of insurance and finance charges, and received that sum plus a 1940 Hudson, for which no allowance was made, in full payment. Urban handled the transaction. On June 2, Logan Square sold a new Nash to James A. Schoke for $2,181.06, of which amount $200 was received by Logan Square in cash at the request of the unidentified person making the sale. On Jaune 11, Logan Square *306 sold a new Nash to Samuel Buscemi for $2,216.77, of which sum $300 was received in cash by Healy at his request. On June 15, Logan Square sold a new Nash to John F. Bajerski for $2,073.17, of which amount, $1,873.17 was received by check, and $200 was received in cash by Urban at his request. On June 25, Logan Square sold a new Nash to Francis E. Schwerzler for $1,900, and received the sum of $1,900 and a 1937 Nash Lafayette in full payment, Logan Square making no allowance for the Nash Lafayette. Urban made the sale. On August 4, Logan Square sold a new Nash to Frank S. Gramza for $2,429 and received $2,400 plus a 1936 Nash, for which Logan Square allowed $29. Urban handled the transaction. The sale price was shown on the bill of sale and entered on the books and records of the corporation as $2,400. On August 18, Logan Square sold a new Nash to Sig C. Krupa for $2,278.87, of which amount $1,903.87 was received by check, and $375 was received in cash by Urban. On September 9, Logan Square sold a new Nash to Ernest Baumann, Jr., and his wife, Hermina, for $2,400, of which sum, $2,028.10 was received by check, and $371.90 was received in cash by an unidentified person making *307 the sale. On October 7, Logan Square sold a new Nash to Theodor Krajewski for $2,150, which sum was received in cash by Urban at his request. The sale price was shown on the bill of sale and entered on the books and records of Logan Square as $1,850; omitted was the receipt of $300. In his statutory notices of deficiencies for the year 1948, respondent determined that Auto Mart and Logan Square failed to report income from the sales of automobiles in the amounts of $6,020, and $28,479.69, respectively. He further determined that Healy and Urban failed to report as income, constructive dividends from the corporate petitioners in the amount of $17,249.84 to each of them. For the year 1946, Logan Square, acting through its president and principal, Urban, willfully understated its sales receipts on its bills of sale and books by certain payments which Urban required in cash from customers. Urban, during the year 1946, received payments in cash from customers of both corporate petitioners, which amounts he retained and deliberately failed to report on his income tax return for that year. The deficiency in tax of Logan Square for the year 1946 is due in whole or in part to fraud *308 with intent to evade tax. The deficiency in tax of Urban for the year 1946 is due in whole or in part to fraud with intent to evade tax. Although Healy and Urban were formally disassociated from Logan Square and Auto Mart, respectively, as hereinbefore stated, they both retained dominion and control over both corporate petitioners during the years in issue. During the years 1947 and 1948 Healy and Urban cooperated in a course of conduct whereby some part of the corporate petitioners' sales income was omitted from their income tax returns. During these same years, Healy and Urban received substantial amounts in cash from sales made by them which they retained and failed to report as income. Auto Mart and Logan Square filed false and fraudulent returns for the years 1947 and 1948, with intent to evade tax, and a part of the deficiency for each year is due to fraud with intent to evade tax. Urban and Healy filed false and fraudulent returns for the year 1947, and joint returns for the year 1948, and a part of the deficiency for each year is due to fraud with intent to evade tax. Opinion For the years 1947 and 1948, the respondent has established fraud by clear and convincing *309 evidence. In making sales, Healy and Urban determined the amount which would be stated on the bill of sale as the sales price. The record discloses that portions of the sales prices of sales made by them were often omitted from the bills of sale. Smyth, petitioners' accountant, testified in effect, that if an amount was omitted from a bill of sale, it would also be omitted from the corporate books and records, and income tax returns. The fact of omission is clearly established. In light of other facts revealing fraudulent intent to conceal sales income, the fact that the amounts we have found to have been omitted from the bills of sale and books of the corporate petitioners constitute, as petitioners argue in their reply brief, only a small percentage of the total amount of sales income determined by the respondent to have been unreported, is not critical to the fraud issue. Although only a small percentage of total income allegedly was unreported, the amounts proved to have been received and unreported were substantial and were received in at least fifty transactions. This is without considering as unreported income, which it clearly is, the unrecorded portion of the value of *310 automobiles received in trade, automobiles for which either little or no allowance was made against the purchase price, when in fact such automobiles had considerably greater market value. Urban often and Healy occasionally requested of a customer that he pay for his automobile partly in cash, and it was usually the amount of the cash payment which was omitted from the bill of sale price. Further, where an automobile was traded in, insofar as the sales of record disclose, there was a consistent failure to record on the bills of sale and corporate records its receipt, even in those instances where an allowance against the sales price was made for it. These same trade-ins were often resold to Willys and to other parties, usually for cash, at the request of Urban and Healy, and such sales were not recorded on the books and records of the corporate petitioners. The use of checks made out to the new automobile customer as payee admits of no other motive than to conceal a corporate petitioner as the actual seller of the used automobile. While Healy did not as frequently as Urban engage in the practice of requiring cash payments, his part in so concealing the corporate petitioners as the *311 sellers of these trade-ins has been clearly shown. Urban's plea of guilty to a charge of criminal evasion of taxes would alone be sufficient to establish his fraudulent conduct for the years 1947 and 1948. Leon Papineau, 28 T.C. 54 (1957). Further evidence of fraudulent intent to evade tax on the part of Healy and Urban is set forth in our findings; it is not necessary to restate it here. Healy and Urban were the sole and equal shareholders of both corporations, and each was the principal officer of one. Their purpose of "disassociation" was the retention of franchises alone; the record discloses that they both acted freely for either corporation, much as though they had retained their former corporate offices prior to the disassociation. In short, they were in complete control of both corporations, and the "disassociation" as set forth in our findings was formal and superficial rather than of significance. Their fraudulent conduct in respect to sales activities during the years 1947 and 1948 is legally attributable to and the omitted sales receipts were income of the corporate petitioners. United Dressed Beef Co., 23 T.C. 879 (1955). Harry Sherin, 13 T.C. 221 (1949), *312 relied on by petitioners, is clearly distinguishable because of the active participation by both Urban and Healy in the fraudulent conduct. The respondent's determinations of deficiencies against the corporate petitioners for each year in issue must be sustained. For the years 1947 and 1948, Healy and Urban, for reasons already stated, were responsible for the understatement of income on the corporate returns. Those returns were false and fraudulent with intent to evade tax. The statute of limitations not being a bar, the deficiency determinations for those years, as for the year 1946, are presumptively correct. Chesterfield Textile Corporation, 29 T.C. 651 (1958); Leonard B. Willits, 36 B.T.A. 294 (1937). Healy's self-serving testimony that he did not receive any unreported amounts, and that of petitioners' few purchaser witnesses to the propriety of the manner in which their transactions with the corporations were handled is insufficient to rebut that presumption, reinforced as it is by the finding of many improperly recorded transactions. See Louis Halle, 7 T.C. 245 (1946), affd. 175 F. 2d 500 (C.A. 2, 1949). The exact basis *313 of the respondent's computation of the amounts of the deficiencies is not clear, but whether based on a projection of the proven unreported amounts over the total number of sales for each year, or upon more precise information not before us, it has not been shown that the amounts determined were unreasonable or arbitrary. Both Healy and Urban received certain sums in cash from sales made by both of the corporate petitioners during each of the years 1947 and 1948. The factors proving fraudulent intent need not be repeated. They filed fraudulent returns for these years omitting these amounts with intent to evade tax. The statute of limitations is thus not a bar, and the respondent's determinations of deficiencies against them for each year in issue, and their wives for the year 1948, is presumptively correct. Chesterfield Textile Corporation and Leonard B. Willits, both supra. There is no evidence in rebuttal of importance. It is neither alleged nor evident that the corporations obtained these sums from them, nor that they expended on behalf of the corporate petitioners amounts received from sales. These amounts were unreported income of the corporations. No dividends were declared, *314 but since the recipients were in complete control of the corporations, to the extent of available earnings and profits the amounts determined by the respondent to be constructive dividends to each of them on the basis of equal stock ownership are taxable to them as such. Ginsberg Estate v. Commissioner, 271 F. 2d 511 (C.A. 5, 1959), affirming a Memorandum Opinion of this Court of May 26, 1958; Chesterfield Textile Corporation, supra; Jack M. Chesbro, 21 T.C. 123 (1953), affd. 225 F. 2d 674 (C.A. 2, 1955). Harry Sherin, supra, is distinguishable. In determining the amount of earnings and profits available for distribution as constructive dividends to Healy and Urban, and taxable as such, there must be added to the earnings and profits otherwise available the income resulting from the unreported sales as determined by respondent. Further, adjustments to earnings and profits necessary because of our determinations herein shall be made in accordance with our decision in Estate of Esther M. Stein, 25 T.C. 940, 965 (1956). We are not clearly convinced that the deficiencies in tax for the year 1946 were due *315 to fraud with intent to evade tax on the part of Healy and Auto Mart. In respect to Auto Mart, respondent proved only three sales resulting in unreported income. Healy was not clearly implicated, although he participated in two of them. The third sale handled by Urban is, together with sales made by him for Logan Square during the year, persuasive of fraudulent conduct on his part. But, considering all three sales, it has not been proven that during this first year before us Healy or Urban had in respect to Auto Mart initiated the course of fraudulent conduct which was so evident later. In so holding, we are not relying on the principle set forth in Harry Sherin, supra, that is, we fail to find fraud in respect to Auto Mart not because neither Healy nor Urban alone could have acted for the corporation, but because we have not found that either did so. Respondent has not proved that Healy received any unreported amounts during the year 1946, and Healy's deficiency in that year is not due to fraud with intent to evade tax. During the year 1946, Urban participated in at least four sales in which unreported income was received. In three of these transactions, he received *316 cash from the purchasers at his request which was reported neither on the corporate books nor on his own tax return. Further, he participated in the sale of September 17 by Auto Mart in which no allowance was made for a tradein, the receipt of which was not recorded. In light of these activities, we are convinced that the pattern of fraudulent conduct already mentioned and so evident during the years 1947 and 1948 was initiated by Urban during the year 1946. Urban's deficiency in tax for the year 1946 was due in part to fraud with intent to evade tax. Acting on behalf of Logan Square, Urban received from two sales $1,100 of unreported income during the year 1946. On another sale made by Logan Square during the year, $400 of income was received by it in cash as a "bonus" with intent to conceal its receipt. The question to be decided is whether respondent has proved that during this year Logan Square had begun the pattern of fraudulent omission already referred to. Petitioner contends that these actions by Urban were done on his own behalf, that it has not been proven that Healy knew of or participated in such conduct, and that since Healy was a 50 per cent shareholder, the receipt *317 of these unreported amounts cannot be considered corporate income. Harry Sherin, supra.However, in the Sherin case, it was found that Sherin, the equal stockholder not receiving the payments in excess of ceiling prices, not only did not know of them until after they had been received by the other shareholder and president, Berger, but "remonstrated with Berger" when he learned of them, and further, "he never claimed or received a share of such commissions for himself or for the corporation." In the instant case, we are satisfied from the entire record that Healy either did know of Urban's actions during 1946 and acquiesced in them, or, if he did not know, would have so acquiesced if he had learned of them. Urban was president of Logan Square, and was perhaps the most active of the two shareholders in making sales. Healy's acquiescence in his fraudulent conduct during the year 1946 is more than reasonably inferable, and, therefore, Logan Square is responsible for Urban's fraudulent conduct. Again no serious question of an offsetting embezzlement deduction is present. Part of the Logan Square deficiency for the year 1946 is due to fraud with intent to evade tax. United Dressed Beef Co., supra; *318 George M. Still, Inc., 19 T.C. 1072 (1953), affd. 218 F. 2d 639 (C.A. 2, 1955). Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: James E. Healy, Docket No. 53438; Estate of Alvin A. Urban, Deceased, Orville E. Urban, Executor, Docket No. 53439; James E. Healy, Elizabeth Healy, Docket No. 67710; James E. Healy, Docket No. 67711; Estate of Alvin A. Urban, Deceased, Estate of Alyce Urban, Deceased, Orville E. Urban, Executor, Docket No. 67712 Docket No. 67713; Logan Square Auto Mart, Inc., Docket No. 67714; Logan Square Motors, Inc., Docket No. 67715.↩
2. All section references are to the Internal Revenue Code of 1939.↩
3. In three of these transactions James thought that he was buying from Logan Square, and recorded the purchases accordingly. In the fourth he was in doubt. However, the parties have stipulated that the sales were among those reflected on the books and records of Auto Mart; accordingly, we have concluded that, in fact, Urban was acting for Auto Mart in making these sales.↩